# EXHIBIT C

NOTE:

To protect the privacy of individual non-parties involved in this lawsuit, Plaintiff will be using the pseudonyms Able, Baker, Cable, and Davis. Able is the complainant concerning the verbal jokes and comments leading to the charge of sexual harassment. Baker is the complainant concerning non-consensual sexual contact. Cable and Davis are additional witnesses who were interviewed during the investigation.

The letter that was sent as Exhibit C used the actual names of the witnesses.

January 27, 2020

<u>**VIA EMAIL: ctparkey@alaska.edu**</u>
Chase Parkey
Acting Title IX, EEO, & Clery Compliance Coordinator
University of Alaska Southeast
Hendrickson Bldg. Suite 202
11066 Auke Lake Way
Juneau, AK 99801

    **Re:**    <u>**Daniel MacDonald**</u>

Dear Mr. Parkey and appropriate discipline authority as applicable,

### I. Introduction.

To begin, this letter is in reference to the evidence given for review regarding Daniel "Danny" MacDonald (hereinafter, "Daniel") and allegations regarding sexual harassment at the University of Alaska (hereinafter, "UA"). The investigator responsible for collecting the evidence, mostly through the form of transcribed witness statements is Acting Title IX Coordinator Chase Parkey (hereinafter, "Chase"). There are multiple issues with respect to this investigation, but the overriding ones lead to the following conclusions: (1) it is reasonable to conclude, particularly given his own statements during the investigation, that Daniel made inappropriate jokes and comments; (2) the allegations regarding more serious issues are poorly-developed and do not meet the "preponderance of the evidence" standard; and (3) the investigation, and particularly the conduct of Chase, present issues that are concerning, and suggest Due Process and FERPA violations themselves on his part.

Secondly, given the enormous volume of the transcripts making up the evidence in this case (284 pages of interviews), it is impossible to fully examine and analyze ever claim or argument made within. As a result, there are instances which are necessarily condensed in favor of more general statements about the evidence and the investigation itself.

### II. The "Preponderance of the Evidence" Standard.

A "preponderance of the evidence" means that the evidence has more convincing force than that opposed to it (hereinafter, the "POE Standard"). If the evidence is so evenly balanced that a determiner of fact is unable to say that the evidence on either side of an issue preponderates, the determiner of fact must find against the party who had the burden of proving it.

### III. FERPA Reporting Limitations Regarding Outcomes of Proceedings.

The U.S. Department of Education's Office of Civil Rights recommends that a school:

> provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final. This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions. For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.
>
> U.S. Department of Education Office of Civil Rights, *"Q&A on Campus Sexual Misconduct"*, September 2017, available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, p. 6.

This limitation of the reporting requirement allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act (hereinafter, "FERPA". *See*, 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party *only* in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13). However, For the purpose of FERPA, the "final results" of any disciplinary proceeding:

> (i) shall include only the name of the student, the violation committed, and any sanction imposed by the institution on that student; and
>
> (ii) may include the name of any other student, such as a victim or witness, only with the written consent of that other student.
>
> 20 U.S.C. § 1232g(b)(6)(C).

In other words, a postsecondary institution should not be disclosing the facts of an ongoing investigation to other witnesses or alleged victims but *could* disclose certain specific information at the conclusion of the investigation to the alleged victims.

### IV. Analysis.

#### A. There is sufficient evidence showing that Daniel made inappropriate remarks.

Notably, Daniel does not dispute making inappropriate remarks. For example, he stated, "I did say the inappropriate jokes. I did." (p. 7/11 of Daniel's Interview on 11/11/2019).

#### B. On the other hand, there is little evidence of Daniel performing any kind of physical harassment.

##### 1. Able.

In Able's interview of 11/14/2019, Chase asks her point blank: "Has Daniel ever tried to physically touch you or put his hands on you in a way that would be other than just a handshake or quick hug, that would be generally considered appropriate?" Able's responses was that, "I don't think so, not that I remember. Yeah, I think it was all just verbal." (p. 9/16 of Able's Interview on 11/14/2019). This is backed up by Baker's testimony, who also remarks upon Able being "one of the most trustworthy people I can think of." (pp. 3-4/31 of Baker's Interview on 11/13/2019).

##### 2. Baker.

Daniel's description of his relationship with Baker was that it was a, "consensual physical relationship, which mostly engaged in cuddling" between them, and further stated that he had received permission from her to put his hand on her buttocks. (p. 1/11 of Daniel's Interview of 11/11/2019). Daniel asked to kiss her a couple times, but she said "no", and he did not attempt to force the issue. (p. 3/11 of Daniel 11/11/2019). Eventually, Daniel moved on, and Baker did not like that he stopped reciprocating cuddling. (p. 2/11 of Daniel 11/11/2019).

Notably, Baker described herself as a high-functioning autistic person, and a failure to notice social cues is a common personality trait of such people. *See, ex.* Landa, Rebecca, "Social Language Use in Asperger Syndrome", *Asperger Syndrome*, New York: Guilford Press (2000), p. 149. This is of particular importance when understanding the behavior dichotomy between Baker and Daniel, who has a history of awkwardness in social situations. (Much of the evidence clearly paints a picture of Daniel as someone who is having difficulties in social situations with friends and acquaintances, and therefore resorts to peculiar attempts to be "funny".) According to Daniel, many of the social cues that she was sending out, intentional or not, when they were together indicated that she had a "crush" on him, and so it is not altogether surprising that he thought aspects of their relationship were more serious than she believed.

In addition, Cable backs up Daniel's assertion that he obtained consent from Baker to touch her buttocks. Baker would also sometimes lay on top of Daniel, and this kind of behavior, while it may have seemed ordinary to Baker, this also sent social cues that perhaps she did not realize she was sending. Furthermore, many of Baker's statements regarding why she was concerned about Daniel are in reference to commonplace incidents, such as Daniel throwing a book at a futon in anger at being fired, as if such behavior is not common among young men, or her peculiar concern

for Daniel owning a sledgehammer, even when he explained how it was used in physical fitness routines (again, a commonplace usage).

Curiously, Baker seems to attach significance to the "Wanna have sex?" picture, although it was clearly a joke that Daniel had had framed because it was funny and "weird", rather than it having some kind of "sinister" connotations. Similarly, the claims regarding Daniel allegedly crying in order to convince her to watch the cartoon movie "Into the Spider-Verse" with him is laughable, even if every word of her description of those events was true.

Baker also appears to have been "eavesdropping" whenever she heard Daniel discussing Cable as a witness, as such conversations were only had in his room without her there. She admits to calling Daniel a "predator" and talking about the Title IX investigation with third parties outside of the investigation. She also admitted to sabotaging Daniel's professional prospects and retaliating against him through her conversations with Erica Hill.

Finally, Baker seems to ascribe a negative motive to every action of Daniel since the investigation began, even casting him attending classes as having sinister motivations.

### 3. Able.

Able's interviews focus primarily on comments that Daniel allegedly stated to other people, most of which are unnamed and simply described in class terms (i.e., "freshmen" or "residents"). Many of the other statements claimed by Able are not in and of themselves inappropriate and are presented by her as being double-entendres or the like (i.e., "If you only knew" and similar comments that Able interprets as being sex-related).

Furthermore, Able's comments regarding anxiety, depression, and not feeling "safe" to leave her room are not credible when looked at in context with the statements that she accuses Daniel of making, and she also states that she was already suffering from anxiety and depression due to the move from Tennessee to Alaska and family problems with her mother. (p. 2/9 of Able 12/13/2019). In general, many of Able's comments, when evaluated individually, fail to rise to any level of violation, particularly when viewed in concert with the situation and context. Able suggests cornering, issues w/Baker.

Although Daniel has not been speaking to people at school about the investigation, as he finds it very embarrassing, Able states that, "I had a random person ask me if I was Able from Daniel's investigation, and I was like, 'No. I don't know what is going on.'" (p. 7/9 of Able 12/13/2019). If nothing else, this spreading of gossip shows a failure on the part of the other witnesses to take seriously the confidential nature of the investigation.

### C. Investigation Errors and Violations of FERPA.

The evidence shows an overall lack of professionalism on the part of Chase Parkey, the investigator, as well as FERPA violations during the transcribed interviews.

### 1. Professionalism.

For example, Chase's language in the transcribed interviews is unprofessional and crude, and borders on Title IX violations itself. One example of this behavior is in the 11/13/2019 interview with Baker, wherein he stated:

> Are you aware of anything about [Daniel] talking to Able saying other girls have nice asses? What was the term he used? Or commenting on a girl's ass?
>
> (p. 2/31 of Baker's Interview on 11/13/2019).

There simply is no reasonable explanation for speaking to an alleged victim or witness in such crude terms. It is also clear from the context that he is not specifically quoting Daniel here.

Additionally, Chase related details to witnesses incorrectly, such as when talking to Baker, he described Daniel as having said that he was on top of Baker, when Daniel had actually described the incident to Chase as Baker being on top.

Furthermore, in Baker's 11/6/2019 interview, Chase appears to urge Baker to file a complaint, tells her that there are other complaints against Daniel, and other inappropriate comments, such as:

> I mean, I can't be biased because then I can't investigate it. But you're not the only one. And again, I could only say that because you know it.
>
> You're not the only one. And I think if you were to talk to Able and not obviously pressure her, but ask her if she would consider doing the investigation as well. I can do both at the same time.
>
> (p. 12/17 of Baker's Interview on 11/6/2019).

Chase also told Baker that it was okay to talk to other students about the investigation, which is particularly disturbing given the context of Baker wondering if that would be "retaliation":

> Baker: And with me, like telling my friends about what happened. Would that be considered retaliation against him?
>
> Chase: It depends on how you tell them. If you go walking around campus with a sign, maybe. If you just talk to someone like you do with Kelly or Able, no.
>
> (p. 13/17 of Baker's Interview on 11/6/2019).

Another disturbing comment from Chase is when he tells Baker that he, "cannot tell Able that I talked to [Baker]." (p. 16/17 of Baker's Interview on 11/6/2019). This is particularly

interesting given that it shows that Chase apparently knows not to be talking about other witnesses' statements and claims, even though he does exactly that many times in the interviews with witnesses, including telling Baker all kinds of confidential information about the investigation. Shortly after this segment of the conversation, Chase begins telling her how to accumulate more witnesses to back up her statements, how to help move the investigation forward, etc. Id.

This becomes even more of an issue with respect to Cable's comments about the retaliation and backlash that Daniel has been facing since the investigation began, such as how "everybody now sees him as like a sexual predator because that's what's going around." (p.22/26 of Cable's 12/13/2019 Interview). This gives credence to Daniel's allegations that Baker told Professor Erica Hill that Daniel was a "sexual predator" and convinced her not to write a letter of recommendation for him.

### 2. Improper Interview & Interrogation Techniques.

In Baker's 11/6/2019 interview, Chase brags of having been a law enforcement officer, and frankly, it shows, but not in a good way. Law enforcement officers are often trained in Reid-style interview and interrogation techniques, which are used primarily to extract confessions. However, these techniques can often badger and manipulate a witness when used improperly.

An example of this occurs in Cable's 12/13/2019 interview, where Chase appears to be trying to persuade Cable to speculate about Daniel, when she keeps answering that she does not know. (pp. 15-17/26 of Cable's 12/13/2019 Interview). This is also evident in Davis' 11/14/2019 interview, where Chase presents leading questions in order to coax Davis into agreeing with his preconceived notions of the facts, rather than actually allowing Davis to explain events in his own words. (pp. 8-9 of Davis' 11/14/2019 Interview).

### 3. FERPA Violations.

There are multiple examples throughout the transcripts of interviews where Chase discloses confidential information about the pending investigation. One particularly egregious example occurs in Able's 11/14/2019 interview, wherein first he first states that, "[Daniel's] termination from an RA had nothing to do with Title 9 whatsoever. I'm not sure where that came from." However, he goes further and states specifically that, "[Daniel] has admitted to saying inappropriate things to [Able]. He has owned up to that fact." (p. 15/16 of Able's Interview of 11/14/2019).

While Chase may have been disclosing this information to Able in some form in order to ingratiate him to her such that she gives up more information during the interview, it is highly inappropriate.

### V. Application of the POE Standard.

Although it is clear that the evidence in favor of finding a serious violation is of significantly less weight or credibility, even in the best light the evidence is scant and circumstantial. In addition, even if the evidence was viewed from a perspective of prejudice and

bias against Daniel, there simply is little evidence of any violations beyond the comments that Daniel has admitted to having said. In contrast, the evidence disputing and/or failing to corroborate the existence of a violation is significantly greater.

Again, under the POE Standard, a violation would only be found to have occurred if the evidence in favor of a violation has more convincing force than that opposed to it. Here, at *best*, one could possibly conclude that the evidence is evenly balanced, but in that situation, a determiner of fact must find against the party who had the burden of proving it. Here, there is simply not even close to enough evidence in favor of a violation to overcome the POE Standard.

### V.     The Consequences.

Daniel has much to lose if the University finds a violation and dismisses him. He has only a few months left before graduation, and there simply is little reason to tarnish his record with unsubstantiated claims from witnesses who have already shown a tendency to retaliate and spread rumors about him throughout the school. In short, Daniel has suffered enough, and he now has enough retaliation against him for his own Title IX investigation against many of his accusers. (However, given the obvious bias on the part of Chase, expecting him to conduct an impartial investigation in this case would be absurd.)

### CONCLUSION

In conclusion, it is time to stop the madness and put an end to Chase's reckless investigation. All of the parties at this point have suffered as a result of Chase's pressuring of witnesses to file complaints, and with the clear slandering of Daniel's name at the University, it is incontrovertible that enough damage has been done out of proportion to even the most serious claims and allegations. When viewed under the POE standard, Daniel admits to having made some comments that he now realizes were inappropriate, but that is all that can rise above the evidence standard. As a result, Daniel hopes and trusts that you will afford this letter the due consideration

necessary in order to ensure that actual justice and fairness are respected. Thank you and we look forward to your response.

                                                            Sincerely,

                                                      /s/ Daniel MacDonald

                                                      _____
                                                      Daniel "Daniel" MacDonald

                                                      /s/ Joseph D. Lento

                                                      _____
                                                      Joseph D. Lento, Esquire

Cc:     Joseph D. Lento, Esquire
           Lento Law Firm
           1500 Walnut Street, Suite 500
           Philadelphia, PA 19102
           215-535-5353
           Joseph@JosephLento.com